**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARMENIA LEVI CUDJO, Jr.,
            *Petitioner-Appellant,*

v.

ROBERT L. AYERS, Jr., Warden,
California State Prison at San
Quentin,

            *Respondent-Appellee.*

No. 08-99028

D.C. No.
2:99-cv-08089-JFW

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
February 7, 2012—Pasadena, California

Filed September 28, 2012

Before: Alex Kozinski, Chief Judge,
Diarmuid F. O'Scannlain and N. Randy Smith,
Circuit Judges.

Opinion by Judge N.R. Smith;
Dissent by Judge O'Scannlain

11865

## COUNSEL

John Lewis Littrell, Deputy Federal Public Defender, Office of the Federal Public Defender for California, Los Angeles, California, for the petitioner-appellant.

James W. Bilderback, II, Supervising Deputy Attorney General, Office of the Attorney General for California, Los Angeles, California, for the respondent-appellee.

**OPINION**

N.R. SMITH, Circuit Judge:

In *Chambers v. Mississippi*, 410 U.S. 284 (1973), the United States Supreme Court clearly established that the exclusion of trustworthy and necessary exculpatory testimony at trial violates a defendant's due process right to present a defense. This clearly established federal law applied at the time the California Supreme Court decided *People v. Cudjo*, 863 P.2d 635 (Cal. 1993) (en banc) (per curiam), the subject of this habeas appeal. The facts in *Chambers* are materially indistinguishable from the facts in this appeal. Therefore, the California Supreme Court's decision was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1), and the error was not harmless. Accordingly, the district court's denial of Petitioner's habeas petition is **REVERSED**, and we **REMAND** this case to the district court with instructions to issue the writ of habeas corpus as to Petitioner's conviction.[1]

## I.  FACTS AND PROCEDURAL HISTORY

### A.  Investigation and State Court Trial of Petitioner[2]

Amelia Prokuda was found dead in her apartment in March of 1986. A pathologist determined the cause of death to be

---

[1]Because we grant relief on this claim, we need not address the other issues raised in Petitioner's opening brief. *See Hurles v. Ryan*, 650 F.3d 1301 (9th Cir. 2011).

[2]The California Supreme Court's decision in *Cudjo*, 863 P.2d at 642, is the last reasoned decision on this issue, so this is the decision to which federal courts owe heightened deference. *See Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). Accordingly, the preliminary facts relevant to this specific issue have been summarized from that state court decision, which are afforded a presumption of correctness that may be rebutted only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002).

multiple blows to the back and sides of the head. Investigating officers found semen present on the victim's right inner thigh and genital area, but there was no indication of traumatic sexual assault. Tests of Prokuda's blood found no drugs or alcohol.

Officers followed footprints from the victim's house to a camper within sight of the victim's house. Petitioner and his brother, Gregory Cudjo ("Gregory"), were found in the camper and were arrested. Analysis of the semen found on the victim revealed that it could have come from the Petitioner, but not from Gregory or the victim's husband. Shortly thereafter, Petitioner was charged with, among other things, first degree murder while engaged in a robbery and a burglary. Petitioner pleaded not guilty to all charges.

Investigating officers interviewed Gregory Cudjo ("Gregory") the day after the victim's murder and tape-recorded the interview. In these interviews, Gregory maintained that he had remained in the camper throughout the morning, but that Petitioner had been gone for about two hours. Gregory also said that, when he and Petitioner saw officers following shoe tracks from the victim's home to Petitioner's camper, Petitioner confessed to Gregory that he had murdered the victim. According to Gregory, during the short amount of time that it took the police to walk the third of a mile to the camper, Petitioner was able to relay extensive details about the crime and the house. These details included what the victim was wearing, that there was a pet snake in an aquarium, that there was a little boy in the house, that there was a jacket with medals in the closet, and how the Petitioner hogtied the woman with neckties. Gregory mentioned nothing of Petitioner raping or having sex with the victim. At the preliminary hearing, Gregory largely repeated this story.

At trial, the prosecution called Prokuda's five-year-old son, Kevin, who was at home during the murder. Kevin testified that a man came into the house, put a knife to his mother's

neck and demanded money. The man took Kevin's mother into the room and tied her up, and Kevin went into his own bedroom and stayed there for a long time. Kevin could not identify the Petitioner as the perpetrator. However, Kevin testified that, on the day of the murder, the man who threatened his mother had *no tattoos on his arms and no facial hair.* A photograph in evidence taken on the day of the murder showed that Petitioner had a goatee or mustache as well as tattoos on his biceps, his right shoulder, and his lower left arm. Gregory had no facial hair on the day of the murder.

The prosecution intended to call Gregory as a witness at trial, but Gregory refused to testify for the prosecution and invoked his privilege against self-incrimination. However, Gregory's preliminary hearing testimony and statements to the police inculpating Petitioner were read into evidence.

The defense's theory at trial was that Petitioner was innocent, and that his brother Gregory had killed Prokuda. This theory was partially predicated on the testimony of John Culver, a witness who "was prepared to testify that Gregory Cudjo had admitted responsibility for the murder of [Prokuda] while Culver and Gregory were incarcerated together at the Antelope Valley sheriff's substation." *Cudjo*, 863 P.2d at 646. The prosecutor objected to the admissibility of the evidence.

Out of the jury's presence, Culver testified that he had known the Petitioner and his brother Gregory for about 15 to 20 years. When Gregory and the Petitioner were arrested and brought to the Antelope Valley sheriff's station (shortly after the murder of the victim), Culver was also incarcerated there. At that time, Gregory was locked in a cell with Culver. Culver testified that, while in the cell, Gregory was pacing restlessly. Culver asked him what was wrong. Gregory answered, "Man, they got me in here for a murder" and "I need [to] talk to somebody." *Id.* at 647 (alteration in original). Gregory then "started talking about why he'd done it and what he'd done . . . ." *Id.* According to Culver, Gregory said: "I went over to

rob, burglarize this lady's house and she seen me and then that's when all the stuff went down and that's what happened." *Id.* Gregory then described how he "went in the house and this woman supposed to have been washing clothes, and she caught him coming in the house." *Id.* "When the woman seen him he just started beating the woman up and then she started screaming, so he knocked her out and went and done it again, kept hitting her, kept hitting her . . . . He kept banging her around in the head." *Id.* He "knocked her out," and when she "came back to" he "started hitting her and hitting her with a hammer or whatever he hit her with." *Id.*

According to Culver, Gregory said that he found guns and jewelry in the house. Gregory explained that he knew the victim, because they had "smoked dope together." *Id.* As the California Supreme Court also noted, "Gregory did not mention raping the woman." *Id.*

The prosecutor then cross-examined Culver and asked "if Gregory had mentioned anyone besides the woman being present in the house." *Id.* Culver responded that Gregory had not mentioned it at the time. However, "Culver had talked to Gregory shortly before Culver's testimony," and, through this conversation, Culver had learned that there "probably was a little boy or somebody in the house." *Id.* Culver also testified that, thereafter, Gregory had been removed from the cell he shared with Culver. When Gregory returned, he told Culver that detectives had interviewed him about the murder. The prosecutor asked whether Gregory told Culver that he had blamed his brother for the murder. *Id.* Culver at first said that Gregory had done so, but then immediately explained that he merely supposed that Gregory had blamed Petitioner. That supposition was based on the fact that (1) Gregory was released shortly thereafter, and (2) Culver knew Petitioner's criminal history was worse than Gregory's. On further cross, Culver explained that he first spoke about Gregory's confession when a defense investigator contacted and interviewed him three months before this testimony.

After Culver's testimony, the trial court heard argument outside the presence of the jury on whether to admit Culver's testimony. The prosecutor argued that the testimony should be excluded, because "Culver's demeanor, background, and relationship to the defendant, as well as the content of his testimony," made him a "liar" that was "unworthy of belief." *Id.* at 647-48. The trial court asked whether it would be "making a judgment as a trier of fact, and taking it away from the jury," if it made such a determination. *Id.* at 648. The prosecutor answered that the California rules of evidence required that determination on some occasions.

In contrast, defense counsel argued that the testimony should be admitted as an exception to the hearsay rule, because it was a declaration against penal interest under California Evidence Code Section 1230. The trial court agreed that this statement met the hearsay exception for a statement against penal interest. However, the court found that "to allow this testimony would be a travesty of justice," as the evidence lacked the necessary "indicia of reliability." *Id.* Thus, the court ruled that it was not admissible as a declaration against interest. The trial court also later explained that it found Culver's testimony "unreliable and untrustworthy," and that the court made this interpretation when it "intepret[ed] section 1230 of the Evidence Code." *Id.* It buttressed this conclusion with a finding that the probative value of the evidence "was outweighed by prejudice under section 352 of the Evidence Code." *Id.* Accordingly, Culver was not allowed to testify, and Petitioner was the only witness for the defense.

When the trial continued, Petitioner testified that he had known the victim for some time, and that he had consensual sex with her in exchange for drugs on the morning of the crime. Afterwards, he went home and told Gregory what had happened; went for a jog; and, after returning home, he ran errands with his mother and Gregory. Petitioner testified that he did not kill Prokuda.

In closing argument, to discount Petitioner's testimony, the prosecutor argued:

> And what [defendant] wants you to believe, and what I believe to be perhaps the most telling thing in this whole case, is that this woman who, from all appearances is a happily married mother . . . is going to have intercourse with a strange man — frankly any man — *a black man*, on her living room couch with her five year old in the house.

*Id.* at 661 (alteration in original) (emphasis added).

The jury convicted Petitioner on all counts, and Petitioner was subsequently sentenced to death.

## B.   The California Supreme Court's Decision on Direct Appeal

In reviewing the trial court's analysis of the statutory against-penal-interest exception to the hearsay rule, the California Supreme Court concluded that the trial court had erred in several ways. *Id.* at 646, 648. First, to be admissible under the hearsay exception, a declaration against penal interest must be made by a declarant who is unavailable, and the declaration must have been sufficiently trustworthy. In determining whether the statement passes this "threshold of trustworthiness," the California Supreme Court explained that the trial court "may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." *Id.* at 648.

In its application of this law to the circumstances, the California Supreme Court held that it was essentially indisputable that Gregory was unavailable by virtue of exercising his privilege against self-incrimination. Further, Gregory's statement risking criminal liability was on its face against Gregory's

interest. *Id.* at 648-49. However, the court continued that, even if these findings were in dispute and the alleged statement did not fit within the statutory against-penal-interest exception, the trial court still had "discretion to conclude that it was admissible despite its hearsay character." *Id.* at 649. The court noted that

> [b]y Culver's account, Gregory made his statement spontaneously, while alone with an acquaintance, within hours after a murder for which Gregory, who had no alibi, was in custody as a prime suspect. Gregory tended to fit Kevin P.'s description of the assailant, and much of the other evidence, in particular the incriminating shoe prints, was as consistent with Gregory's guilt as with defendant's.

*Id.* Thus, the testimony should have been admitted, because "if made as claimed, [the statement] was *probably true,*" because it was given "under circumstances providing substantial assurances that the confession was trustworthy." *Id.* at 649-50 (emphasis added).

The court acknowledged that some of the alleged statements by Gregory were "inconsistent to some extent with the physical evidence, most notably the evidence that the victim was hogtied before she was beaten to death." *Id.* at 649. However, the court explained that "such discrepancies might be attributable to Gregory's agitation or Culver's misunderstanding . . . ." *Id.*

Second, the California Supreme Court noted that the trial court did "not focus exclusively, or even primarily, on whether Gregory's *hearsay statement* might be false." *Id.* Rather, the court "erred" by "accept[ing] the prosecution's contention that *Culver* was a probable liar who should therefore be excluded as a *live witness.*" *Id.* The California Supreme Court "disagree[d]" with the government's contention that "the trial court could properly consider the credibility

of the in-court witness," and explained that the "credibility of the in-court witness is not a proper consideration in this context." *Id.* The court also explained that "[n]either the hearsay rule nor its exceptions are concerned with the credibility of witnesses who testify directly to the jury." *Id.* Thus, "[e]xcept in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution; such doubts do not afford a ground for refusing to admit evidence under the hearsay exception for statements against penal interest." *Id.* at 650.

Third, in reviewing the trial court's analysis of the prejudice versus probative value of the evidence (Evidence Code section 352), the California Supreme Court concluded that the trial court had abused its discretion. The court explained that there was no claim that admitting Culver's testimony would have "taken an undue amount of time," presented "any apparent danger of confusion of the issues," or created "any danger of 'undue prejudice' to the prosecution." *Id.* On the other hand, the evidence "had substantial probative value," raised the "requisite reasonable doubt" regarding a "highly material" issue in the case, and was "highly necessary" as "no comparable direct evidence of Gregory's guilt" was available. *Id.* The court explained that any doubts about Culver's credibility, however legitimate, "do not constitute 'prejudice' under" this evidentiary rule. *Id.* Rather, such a determination was "properly the province of the jury." *Id.* (internal quotation marks omitted). Thus, doubts about Culver's credibility did not provide a sufficient basis to exclude the testimony, and the trial court's decision to do so was an abuse of discretion. *Id.* at 651.

Lastly, the California Supreme Court addressed the Defendant's argument that "the trial court's exclusion of Culver's testimony usurped his federal due process and fair trial rights," in essence depriving him of his constitutional "right to present a defense." *Id.* The court admitted that such a violation would require reversal if the government did not prove

the error was harmless beyond a reasonable doubt. *Id.* (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). However, the court found "no constitutional violation." *Id.*

The court explained that "the mere erroneous exercise of discretion under . . . 'normal' [evidentiary] rules does not implicate the federal Constitution." *Id.* It construed the United States Supreme Court's precedent on this issue as having held only that "the constitutional right to present and confront material witnesses may be infringed by *general rules* of evidence or procedure which preclude material testimony or pertinent cross-examination for arbitrary reasons, such as unwarranted and overbroad assumptions of untrustworthiness." *Id.* The California Supreme Court stated that the United States Supreme Court has "never suggested that a trial court commits constitutional error whenever it individually assesses and rejects a material defense witness as incredible." *Id.*

Thus, the California Supreme Court concluded that while an individual witness's credibility "is properly the province of the jury . . . absent clearer guidance from above, we will not lightly assume that a trial court invites federal constitutional scrutiny each and every time it decides, on the basis of the particular circumstances, to exclude a defense witness as unworthy of credit." *Id.* at 652. Given that the court determined only a "state law error" had occurred, the court did not apply the federal harmless error test set forth in *Chapman*. *Id.* at 651-52. Instead, the court applied the lower threshold of harmless error required under California state law and found that no prejudice had occurred. *Id.* at 652-53.

Two California Supreme Court Justices dissented on this issue, arguing that the federal Constitution had been violated, and therefore the error was not harmless under the more rigorous federal harmless error analysis. *Id.* at 669 (Kennard, J., dissenting). Justice Kennard explained that the applicable federal law made clear that "[r]estrictions on the right to present defense evidence are constitutionally permissible if they

'accommodate other legitimate interests in the criminal trial process' and are not 'arbitrary or disproportionate to the purposes they are designed to serve.' " *Id.* at 670 (quoting *Rock v. Arkansas*, 483 U.S. 44, 55-56 (1987); *Chambers*, 410 U.S. at 295). However, Justice Kennard argued that the majority had "effectively concede[d]" that "[i]n this case, excluding the testimony of defendant's witness, John Culver, was not reasonably necessary to further any legitimate governmental interest." *Id.*

Justice Kennard also "reject[ed] the majority's suggestion that there was no constitutional violation in this case because the defendant's witness was barred from testifying . . . as a result of the trial court's erroneous application of state law." *Id.* at 671. In Justice Kennard's view, this "suggestion amount[ed] to an odd distortion of the nature and purpose of the constitutional guarantee. What the state and federal Constitution secure for the accused is the right to present a defense, not merely the right to be free of unduly restrictive state laws of evidence and procedure." *Id.* at 671-72. Thus, the dissent concluded that when a "crucial defense witness was not permitted to testify," as in this case, the defendant's constitutional rights were violated. *Id.* at 672. Accordingly, Justice Kennard applied the more demanding federal harmless error test and found that, because "[t]he success of [the] defense depended in large measure on providing the jury with sufficient reasons to credit defendant's explanation . . . the trial court's ruling eviscerated this defense," and was clearly prejudicial. *Id.*

## C.  The Federal District Court's Denial of the Habeas Petition

The district court determined that "there is no question" Culver's testimony regarding Gregory's confession "would have been deemed crucial to the defense case." The district court notes that the trial court acknowledged the defense's theory, when it said "[t]he evidence only shows one person committed the murder, the evidence indicating it's either Mr.

Armenia Cudjo or Mr. Gregory Cudjo." In addition, the district court pointed out that the prosecutor admitted that "this case is going to resolve itself as this is either a flat out, cold felony murder committed by Armenia or it is a premeditated murder committed by Gregory." The district court also noted that the defense only had three witnesses to call to show that Gregory committed the murder: Gregory, James Mitchell, and John Culver. However, both Gregory and Mitchell invoked the Fifth Amendment. Thus, the only witness available to present this testimony was Culver, making his testimony crucial to the defense's theory of the case.

However, the district court conditioned the import of Culver's testimony upon whether it was reliable. The district court found, contrary to the findings of the California Supreme Court, that such testimony was not reliable enough to be admitted into evidence. The district court "adopt[ed] the trial court's reasoning," focusing on the fact that Culver was an old friend of Petitioner, had a felony conviction, had many relatives with criminal records, did not tell anyone about Gregory's confession for a long time and only came forward when interviewed by an investigator. Additionally, the district court noted that some of his testimony could be interpreted as inconsistent with the evidence. Accordingly, the district court "conclude[d] that Culver's testimony would not have substantially bolstered [Petitioner's] defense theory that Gregory committed the murder." Therefore, the district court denied the petition for habeas corpus as to this issue.

## II. STANDARD OF REVIEW

"[W]e review *de novo* the district court's decision to grant or deny a petition for a writ of habeas corpus." *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004).

Because Petitioner did not initiate district court proceedings until 1999, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies. *See Lindh v. Murphy*, 521 U.S.

320 (1997). To obtain relief under AEDPA, a defendant must overcome a high threshold:

> Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of this Court, § 2254(d)(1); or that it 'involved an unreasonable application of' such law, § 2254(d)(1); or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2).

*Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (citation omitted). Thus, these constitute three "exceptions to § 2254(d)'s relitigation bar," *id.*, and each of these clauses "are distinct and have separate meanings,"[3] *Moses v. Payne*, 555 F.3d 742, 751 (9th Cir. 2009) (citing *Lockyer v. Andrade*, 538 U.S. 63, 73-75 (2003)). We now address each of these exceptions in turn.

First, as to the "contrary to" clause, "[a] state court decision is 'contrary to' clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases *or* if the state court confronts a set of facts materially indistinguishable from those at issue in a decision of the Supreme Court and, nevertheless, arrives at a result different from its precedent." *Id.* (quoting *Lambert*, 393 F.3d at 974); *see also Williams*, 529 U.S. at 405-06.

---

[3]Though the meanings are separate and distinct, there may be some overlap. For example, a state court decision that is "contrary to" clearly established law may also be an "unreasonable application" of the legal principle of the governing rule of law. *See Williams v. Taylor*, 529 U.S. 362, 385-86 (2000) ("We . . . anticipate that there will be a variety of cases, like this one, in which both phrases may be implicated.").

When analyzing whether federal law was clearly established, the "*only* definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision." *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer*, 538 U.S. 63; *see also Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) (quoting *Lockyer*, 538 U.S. at 71-72).

Second, as to "the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Moses*, 555 F.3d at 751 (quoting *Lockyer*, 538 U.S. at 75) (alteration in original). Under this exception, the Supreme Court has made clear that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Richter*, 131 S. Ct. at 785 (internal quotation marks omitted). In other words, a state court's inappropriate application of the law does not warrant habeas relief under this prong unless the error was unreasonable. Thus, federal courts are precluded from granting relief under this prong "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786. "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (alteration in original) (internal quotation marks omitted).

Third, as to the clause dealing with "an unreasonable determination of the facts," the statement of facts from the last reasoned state court decision "is afforded a presumption of correctness that may be rebutted only by clear and convincing evidence." *Moses*, 555 F.3d at 746 n.1, 751 (citing 28 U.S.C. § 2254(d)(1), (2), (e)(1)); *see also Hurles v. Ryan*, 650 F.3d 1301, 1309 (9th Cir. 2011) (the reasonability of the state

court's determination of the facts is viewed "in light of the evidence presented in the State court proceeding").

## III. DISCUSSION

### A. Constitutional Error

Petitioner contends that the California Supreme Court unreasonably denied his claim that the trial court erred when it excluded John Culver's testimony regarding Gregory's confession. Petitioner points out that the court expressly found this evidence trustworthy enough that it should have been admitted. Petitioner also argues that the California Supreme Court's decision was contrary to established Supreme Court precedent at that time: specifically *Chambers v. Mississippi*, 410 U.S. 284 (1973). California responds that the state trial court's error did not implicate petitioner's federal constitutional rights, because the proffered testimony was not reliable. This allowed the California Supreme Court to apply the more lenient *state* law harmless error analysis. We agree with Petitioner.

**[1]** As a preliminary matter, we conclude that the district court erred by adopting the reasoning of the trial court and rejecting the factual conclusions in the last reasoned state decision from the California Supreme Court. *See Lambert*, 393 F.3d at 964. The district court determined that Gregory's confession would have been crucial for Petitioner's defense. However, the district court conditioned the import of Culver's testimony upon whether it was reliable. The district court relied on the California trial court's reasoning, rather than the California Supreme Court's reasoning, and determined that Culver's unreliable testimony would not have substantially bolstered Petitioner's defense theory that Gregory committed the murder.

In contrast to the district court, the California Supreme Court did not find that Culver's testimony was justifiably

excludable based on any concerns about reliability. Instead, regarding Gregory's confession, the court concluded that, if it were "made as claimed, [the statement] was *probably true*," *Cudjo*, 863 P.2d at 649 (emphasis added), because it was given "under circumstances providing substantial assurances that the confession was trustworthy," *id.* at 650. The California Supreme Court also found that Culver's testimony "had substantial probative value," raised the "requisite reasonable doubt" regarding a "highly material" issue in the case, and was "highly necessary" as "no comparable direct evidence of Gregory's guilt" was available. *Id.* at 650.

**[2]** Because the California Supreme Court's factual findings have not been rebutted by clear and convincing evidence, the district court was required to give a presumption of correctness to the California Supreme Court's conclusions regarding the facts. *See Moses*, 555 F.3d at 746 n.1. The district court's failure to do so was error.

The California Supreme Court also correctly described the law regarding questions of credibility. The court explained that "doubts" about credibility, "however legitimate," did not constitute prejudice under the rules of evidence. *Cudjo*, 863 P.2d at 650. "Except in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution; such doubts do not afford a ground for refusing to admit evidence under the hearsay exception." *Id.*

Supreme Court precedent makes clear that questions of credibility are for the jury to decide. *See United States v. Bailey*, 444 U.S. 394, 414 (1980) ("The Anglo-Saxon tradition of criminal justice embodied in the United States Constitution . . . makes jurors the judges of the credibility of testimony offered by witnesses. It is for them, generally, . . . to say that a particular witness spoke the truth or fabricated a cock-and-bull story."); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) (discussing the right to offer witness testimony to the

jury). Accordingly, the California Supreme Court was correct in noting the trial court's error in analyzing the credibility of a live witness when determining whether to exclude this witness's testimony.

Before this court, California relies on *Rhoades v. Henry*, 638 F.3d 1027 (9th Cir. 2011), to support the California trial court's decision to exclude Culver's testimony based on credibility (despite its relevance and probative value). But in that case, we upheld the exclusion of the hearsay evidence, because the underlying *hearsay testimony* (from a drunk third party) "lacked 'persuasive assurances of trustworthiness.' " *Id.* at 1034-35. The issue was not whether the *live witness* was reliable. Thus, this case is inapposite. *See id.*

**[3]** Given that the California Supreme Court found that trustworthy and material exculpatory evidence was erroneously excluded from Petitioner's trial, we must determine whether United States Supreme Court precedent (at that time) had clearly established that the exclusion of testimony such as Culver's violated Petitioner's due process and Sixth Amendment rights to present a defense, or whether the California Supreme Court was correct that no such right was clearly established by federal law. After review, we conclude that the California Supreme Court's decision was "contrary to" clearly established federal law. *Chambers v. Mississippi* is controlling Supreme Court precedent that existed at the time, with "materially indistinguishable" facts. 410 U.S. at 295-97. However, contrary to the dissent's assertions, we do not hold that the California Supreme Court engaged in an "unreasonable application" of *Chambers* in a new factual context. Rather, here, where there are no constitutionally significant distinguishable facts between *Chambers* and this case, *Chambers* mandates a different result from that reached by the California Supreme Court.

In *Chambers*, the defendant sought to introduce the testimony of three different third parties who would testify that

another man named McDonald had confessed to committing the murder for which the defendant was being accused. *Id.* at 289. However, the trial court sustained the government's objection to this testimony and ruled that the testimony was not admissible. *Id.* at 289-93. For at least one of these individuals, the United States Supreme Court noted that the trial court did not specify why it chose to exclude the evidence; the state supreme court assumed it was based on an application of the hearsay rule. *Id.* at 293 n.6. The defendant was also unable to cross-examine McDonald about his written murder confession, because of the trial court's application of the state's voucher rule. *Id.*

**[4]** The United States Supreme Court explained that the "right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Id.* at 294. The Court also explained that this right to defend is "not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Id.* at 295. The government's interests must be "closely examined," and they are often embodied by "established rules of procedure and evidence designed to assure both fairness and reliability . . . ." *Id.* at 295, 302.

**[5]** Thus, the Supreme Court balanced the interests of the accused against the interests of the state embodied in the evidentiary rule to determine which interest took priority in this situation. *Id.*; *see also Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985) (describing this test as a weighing of the probative value, necessity, and reliability of evidence against the government interests).

Regarding the trial court's application of the hearsay rules to exclude third party testimony about McDonald's confession, the Court explained:

Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The *testimony rejected by the trial court here bore persuasive assurances of trustworthiness* and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights *directly affecting the ascertainment of guilt* are implicated, *the hearsay rule may not be applied mechanistically to defeat the ends of justice*.

410 U.S. at 302 (emphasis added). Similarly, the Court held that the state's use of the voucher rule "as applied in this case" to prevent cross-examination of McDonald "plainly interfered with Chambers' right to defend against the State's charges." *Id.* at 298. Thus, this "exclusion of . . . critical evidence, coupled with the State's refusal to permit [the defendant] to cross-examine McDonald, denied [the defendant] a trial in accord with traditional and fundamental standards of due process." *Id.* at 302.

Another Supreme Court case with similar facts is *Green v. Georgia*, 442 U.S. 95, 95-96 (1979) (per curiam). In *Green*, at the penalty phase of the trial the court excluded a third-party account of a confession from a co-defendant, because the trial court found this evidence constituted hearsay. *Id.* at 96. The Supreme Court held that, "[r]egardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment." *Id.* at 97. The Court went on to explain that "[t]he excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, and substantial reasons existed to assume its reliability." *Id.* (citation omitted). The

Court held that in these "unique circumstances, 'the hearsay rule may not be applied mechanistically to defeat the ends of justice.' " *Id.* (quoting *Chambers*, 410 U.S. at 302). Accordingly, the Court held that the exclusion of such evidence had denied the defendant a fair trial. *Id.*[4] The Court vacated the sentence and remanded. *Id.*

That *Chambers* controls the factual circumstance of this case is supported by our recent decision in *Lunbery v. Hornbeak*, 605 F.3d 754 (9th Cir. 2010). In *Lunbery*, a woman was prosecuted for her husband's murder and sought to introduce "evidence that the murder had been committed" by the partners of a drug dealer who had previously lived in the couple's home. *Id.* at 758. The trial court excluded this testimony, finding the evidence inadmissible hearsay without "sufficient indicia of reliability," and prejudicial to the prosecution with only slight probative value.[5] *Lunbery v. Hornbeak*, No. CIV S-07-1279, 2008 WL 4851858, at *17-18 (E.D. Cal. Nov. 10, 2008).

On appeal, we held that the defendant's right to present a defense was violated "by the exclusion of probative admissible evidence that another person may have committed the crime." *Lunbery*, 605 F.3d at 760. Specifically, we explained that "*Chambers* controls," because there the Supreme Court focused on the exclusion of relevant exculpatory evidence that "bore substantial guarantees of trustworthiness and was critical to [the defendant's] defense." *Id.* at 761. We noted that "[a]s in *Chambers*, the excluded testimony here 'bore persua-

---

[4]Similarly in Petitioner's case, the California Supreme Court expressly found that whether or not Culver's testimony came within the state hearsay rule, it should have been admitted, because it was "highly material" and "highly necessary," and it would not have taken up too much time or been prejudicial. *Cudjo*, 863 P.2d at 650.

[5]Notably, that is almost *exactly* the same ruling that the state trial court made in Petitioner's case. Also worth noting is that, unlike *Chambers* or Petitioner's case, in *Lunbery* there was no attempt to question the alternative murderer himself.

sive assurances of trustworthiness' and 'was critical to [the defendant's] defense. California's application of its evidentiary rules denied [the defendant] her constitutional right to present a defense." *Id.* at 762 (citation omitted). Thus, we held that the "California court of appeal's conclusion to the contrary constitutes an objectively unreasonable application of *Chambers*." *Id.*

**[6]** Here, as in *Chambers* (as well as *Green* and *Lunbery*), the evidence at trial pointed to a single person committing murder, and the issue of the case was the identity of the perpetrator. *Chambers*, 410 U.S. at 297. As in *Chambers*, Petitioner "endeavored to develop two grounds of defense": that he did not kill the victim, but that an identifiable other person did. *Id.* at 288-89. In both cases, the alternate suspect had allegedly previously confessed to the crime; the defense was prevented from cross-examining the alternate suspect at trial; and the trial court's application of the hearsay rules prevented the defendant's witness from testifying to the alternate suspect's confession. *Id.* at 289-94.

**[7]** In Petitioner's case, the California Supreme Court determined that this confession, if it came about as Culver claimed, "was *probably true*," and was given "under circumstances providing *substantial assurances that the confession was trustworthy*." *Cudjo,* 863 P.2d at 649-50 (emphasis added). That is almost precisely the conclusion of the Supreme Court in *Chambers*. Moreover, the California Supreme Court explained that this testimony had "substantial probative value," was "highly material" and "highly necessary," and there was no other "comparable direct evidence of Gregory's guilt." *Id.* Furthermore, the court determined that this evidence would not be prejudicial, confusing, or unduly time-consuming. *Id.* Thus, no government interest outweighed the value of admitting relevant evidence highly necessary to Petitioner's presentation of his defense. Consequentially, the California Supreme Court determined that the testimony should have been allowed at trial. *Id.* at 651. As a result,

*Chambers* should have controlled. The California Supreme Court should have determined that the trial court's errors and abuse of discretion violated Petitioner's constitutional right to present a defense.

Nor is Petitioner's case distinguishable from *Chambers* on the ground that Gregory invoked his Fifth Amendment right, rather than the outdated voucher rule from *Chambers*. In fact, the situation may have been even more prejudicial to Petitioner. In *Chambers*, the defense was at least able to make McDonald read his written confession, even though he countered it with a renunciation. *Chambers*, 410 U.S. at 291. Thus, although the defendant could not cross-examine the witness, at least the jury heard this alternative story from the alternate murderer himself. In the present case, Petitioner was unable to set forth the testimony of any witnesses that directly indicated Gregory's guilt. While Petitioner's inability to cross-examine Gregory likely did not amount to a confrontation clause violation, it did make the admission of Petitioner's proposed testimony from Culver all the more critical to presenting an adequate defense.

It is possible that the California Supreme Court was unaware of the factual similarities between its case and *Chambers* or *Green*. The only mention it made of *Chambers*' facts was in a parenthetical; it did not observe that *Chambers* also dealt with the application of the hearsay rules of evidence to exclude testimony very similar to that in this case. *See Cudjo*, 863 P.2d at 652. Though the state court's awareness or explanation of Supreme Court authority is irrelevant to determining the correctness of the state court result, *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam), unawareness may explain the lack of discussion of these factually similar cases.

In an attempt to synthesize the United States Supreme Court precedent, the California Supreme Court explained that

> [t]he United States Supreme Court has held that the constitutional right to present and confront material

> witnesses may be infringed by *general rules* of evidence or procedure which preclude material testimony or pertinent cross-examination for arbitrary reasons, such as unwarranted and overbroad assumptions of untrustworthiness. However, the high court has never suggested that a trial court commits constitutional error whenever it individually assesses and rejects a material defense witness as incredible.

*Cudjo*, 863 P.2d at 651 (emphasis added). The court then cited eight United States Supreme Court cases in support of this proposition. *Id.* at 651-52.

It is not entirely clear what the California Supreme Court meant when it referred to "general rules of evidence." *Id.* at 561 (alteration omitted). To the extent that the California Supreme Court was describing these precedents as upholding *only* facial challenges to general rules of evidence, this is clearly incorrect. Both *Chambers* and *Green* challenged the application of the rules of evidence in a given factual scenario, but the Court did not strike down the rule as invalid in either case. *See Chambers*, 410 U.S. at 300, 302 ("While th[e] rationale [for the limitation on the declaration-against-interest hearsay exception] has been the subject of considerable scholarly criticism, we need not decide in this case whether, *under other circumstances*, it might serve some valid state purpose by excluding untrustworthy testimony. . . . [T]he hearsay rule may not be *applied* mechanistically to defeat the ends of justice" (emphasis added)); *Green*, 442 U.S. at 97 (same). Thus, the dissent is inaccurate when it asserts that these cases only dealt with the application of a "impermissible rule." Dissenting Op. 11901.

It is true that many Supreme Court cases in this area of the law deal with challenges to well-established rules of evidence. However, this merely reflects the fact that these types of rules often embody the important government interest necessary to overcome a defendant's right to present a defense. *See*

*Holmes v. South Carolina*, 547 U.S. 319, 327 (2006) ("[W]ell-established rules of evidence *permit* trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." (emphasis added)); *Rock*, 483 U.S. at 56 ("In applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right . . . ."). Clearly the government would not be able to override a defendant's important interest in presenting a defense merely because the government action was based on an arbitrary whim, and not a rule of evidence. *See United States v. Scheffer*, 523 U.S. 303, 308 (1998) (a defendant's right to present a defense "may thus bow to accommodate other legitimate interests in the criminal trial process" when the government action is "*not arbitrary or disproportionate*" (emphasis added) (internal quotation marks omitted)). Thus, the typical presence of a general evidentiary rule in the cases cited by the California Supreme Court results from a requirement on the government, rather than a requirement on the defendant. To hold otherwise would be to turn the constitutional right to present a defense on its head.

**[8]** To the extent that the California Supreme Court believed that it would be extremely difficult to say that a state trial court engaged in an "unreasonable application" of this rule when faced with new factual circumstances and new challenges to evidentiary rules, we agree. *See, e.g.*, *Moses*, 555 F.3d at 758, 762 (upholding a state's decision not to extend the right to present a defense to a new factual challenge to the application of evidentiary rules regarding the admissibility of expert testimony). But that does not preclude a state decision from being "contrary to" Supreme Court precedent when the "facts . . . are materially indistinguishable" from the present case. *Williams*, 529 U.S. at 405. Here, any distinctions between this case and *Chambers* are distinctions without a difference.[6] Thus, the California Supreme Court's

---

[6]The dissent mischaracterizes our holding and then dissents from a new conclusion we do not advocate: that the rule of *Chambers* should be

holding was "contrary to . . . clearly established Federal law." 28 U.S.C. § 2254(d)(1).

## B.   Harmless Error

**[9]** Because we conclude that constitutional error occurred in this case, we must determine whether the error was harmless. In federal habeas proceedings, harmless error analysis requires federal courts to determine "whether the error had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). Under this analysis, when "the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error . . . the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995). This standard is more deferential to the state court than the *Chapman*, analysis required for direct review. 386 U.S. 18. *Chapman* analysis asks whether the error has been proven harmless beyond a reasonable doubt. *See Fry v. Pliler*, 551 U.S. 112, 119-120 (2007).

Thus, if the California Supreme Court had appropriately applied the *Chapman* analysis in analyzing this Constitutional error, this court would be required to defer to that analysis under AEDPA unless it was unreasonable. *Id.* However, if "the state court's harmless error holding is contrary to

---

extended to a new factual situation. We may agree that were the facts of this case distinguishable from *Chambers*, it would be difficult to say that the California Supreme Court had engaged in an unreasonable application of that rule, but the dissent is not able to point to any constitutionally significant differences between the cases. For instance, the dissent ignores the fact that a "general rule of evidence" at issue in both cases was the trial court's application of the hearsay rule. The dissent also argues that Culver was less reliable than the witnesses in *Chambers*. Even if this were true, the fact that the Supreme Court requires credibility questions be left to the jury makes this a distinction without a difference. *See Bailey*, 444 U.S. at 414; *Washington v. Texas*, 388 U.S. at 19.

Supreme Court precedent or objectively unreasonable, then no deference is owed. We revert to the independent harmless error analysis that we would apply had there been no state court holding." *Inthavong v. Lamarque*, 420 F.3d 1055, 1059 (9th Cir. 2005). "The state court's harmless error holding is 'contrary' to precedent if it fails to apply the correct controlling authority . . . ." *Id.* at 1061 (internal quotation mark omitted).

Here, the California Supreme Court did not apply the *Chapman* harmless error analysis required for constitutional violations, because the court determined that no "constitutional violation" had occurred. *Cudjo,* 863 P.2d at 651. Thus, the California Supreme Court determined that only a "state law error" had occurred, and the harmless error analysis that the court applied was only a less demanding state law test. This test said there was no prejudice if it did "not appear reasonably probable" that the verdict was affected. *Id.* (citing *People v. Watson*, 299 P.2d 243 (Cal. 1956)). This legal rule was contrary to the rule in *Chapman* that the government must prove the error was harmless beyond a reasonable doubt, 386 U.S. at 24, and thus we owe no deference to this harmless error analysis. *Lamarque*, 420 F.3d at 1059. Rather, we apply our "independent harmless error analysis" under *Brecht*. *Id.*

Many of the facts highlighted in dissenting Justice Kennard's *Chapman* analysis are also relevant to our harmless error analysis under *Brecht*. We therefore summarize those facts here. Justice Kennard noted that "[t]he success of th[e defendant's] defense depended in large measure on providing the jury with sufficient reasons to credit defendant's explanation," and the trial court's ruling "eviscerated this defense." *Cudjo*, 863 P.2d at 672 (Kennard, J., dissenting). The prosecution's case was "far from compelling." *Id.* "The murder victim's young son, Kevin, could not identify defendant, nor did he recognize the survival knife or the cut-off jeans found in the Cudjo camper." *Id.* "Defendant's fingerprints were not found at the victim's home, and no bloodstains were detected

on any of defendant's clothing, on any articles seized from the Cudjo camper, or on the shoes seized from defendant's mother's automobile." *Id.* "No articles taken from the victim's residence were found in defendant's possession, nor did any witness testify to such possession." *Id.*

Indeed, Justice Kennard noted that law enforcement initially "focused equally on defendant and Gregory." *Id.* "Both Gregory and defendant were present in the camper to which the shoe tracks led, and both Gregory and defendant owned shoes that could have made the tracks. The cut-off jeans and the knife found in the camper were equally accessible to defendant and to Gregory." *Id.* Further, Justice Kennard observed that "[s]ome of the evidence pointed more strongly to Gregory as the intruder that Kevin described," such as Gregory's lack of tattoos or facial hair. *Id.*

Although the victim's body contained semen that could have come from the defendant and not from Gregory, Justice Kennard noted that "the victim's body bore no signs of traumatic sexual assault, Kevin's testimony did not mention a sexual assault, and the physical evidence was consistent with defendant's account of consensual sexual relations with the victim." *Id.* at 672-73.

**[10]** The strongest evidence against the defendant, according to Justice Kennard, came from "Gregory's previous statements to sheriff's investigators . . . ." *Id.* at 673. Yet "this evidence too was equally, if not more, consistent with Gregory's guilt," because it illustrated how knowledgeable Gregory was about the crime and the victim's home. *Id.* But since Gregory "did not testify at trial, the jury was never given an opportunity to judge his credibility." Thus, Culver's testimony "would have filled a major gap in the defense case, and would have greatly increased the likelihood of the jury's entertaining a reasonable doubt of defendant's guilt." *Id.*

**[11]** The prosecutor's reference to Petitioner's race during closing argument also weighs heavily on our prejudice analy-

sis. The California Supreme Court indicated that the prosecutor committed misconduct when he said in his closing argument that it was implausible that "this woman is going to have intercourse with a strange man—frankly any man—a *black man*, on her living room couch with her five year old in the house." *Id.* at 661 (majority opinion) (emphasis added). The court correctly noted that a prosecutorial statement, that includes racial references likely to incite racial prejudice, violates the Fourteenth Amendment. *Id.* (citing *McCleskey v. Kemp*, 481 U.S. 279, 309 n.30 (1987) ("The Constitution prohibits racially biased prosecutorial arguments."); *United States v. Doe*, 903 F.2d 16, 24-25 (D.C. Cir. 1990); *McFarland v. Smith*, 611 F.2d 414, 416-417 (2d Cir. 1979); *Miller v. North Carolina*, 583 F.2d 701, 707 (4th Cir. 1978); *United States ex rel. Haynes v. McKendrick*, 481 F.2d 152, 159 (2d Cir. 1973); *United States v. Grey*, 422 F.2d 1043, 1045-1046 (6th Cir. 1970)). The court also noted that there was no "compelling justification for the prosecutor's racial reference in this case . . . ." *Id.*

However, the California Supreme Court concluded that the statement was not prejudicial, because the prosecutor's remark was "brief and isolated," was one of many factors listed to undermine the credibility of the defendant's testimony, and it added little to the force of the argument. *Id.* In addition, there was "no continued effort by the prosecutor to call attention to defendant's race or to prejudice the jury against him on account of his race." *Id.*

We do not determine whether the California Supreme Court's prejudice analysis for this racial comment in isolation was unreasonable. Rather, we consider the prejudicial effect of this comment in context of the trial court's exclusion of Culver's exculpatory testimony.

[12] In the present case, the trial court's exclusion of Culver's testimony meant that the only testimony Petitioner had to support his theory of the case was his own. Petitioner's

argument hinged on the jury believing that the victim would be willing to have consensual sex with Petitioner. The prosecutor's inappropriate racial statements struck at the core of this defense, by using racial bias to discredit Petitioner's testimony. *See Grey*, 422 F.2d at 1045 ("At worst, the gratuitous reference to the race of the [woman] may be read as a deliberate attempt to employ racial prejudice to strengthen the hand of the [prosecution]."). Thus, because Petitioner's testimony was discredited by an inflammatory racial comment, the exclusion of Culver's testimony became even more prejudicial, dramatically increasing the likelihood that its exclusion "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Therefore, because we have "grave doubt[s] as to the harmlessness of [this] error," we must rule for the Petitioner. *O'Neal*, 513 U.S. at 437.

## IV.   CONCLUSION

**[13]** For the foregoing reasons, we grant a certificate of appealability for this issue and **REVERSE** the district court's denial of Petitioner's habeas petition. We **REMAND** with instructions to the district court to issue the writ of habeas corpus, unless California elects, within 90 days of the issuance of the mandate, to retry Petitioner. Any such retrial shall commence within a reasonable time thereafter to be set by the district court.

**REVERSED** and **REMANDED**.

O'SCANNLAIN, Circuit Judge dissenting:

In the forty years since it was written, *Chambers v. Mississippi*, 410 U.S. 284 (1973), "has been used by the Supreme Court only a handful of times to overturn convictions; and the Supreme Court's standards are quite vague." *Fortini v. Mur-*

*phy*, 257 F.3d 39, 48 (1st Cir. 2001). Yet today we hold that *Chambers* "clearly establishe[s] that the exclusion of trust-worthy and necessary exculpatory testimony at trial violates a defendant's due process right to present a defense." Maj. Op. at 11869. Because "the holding of *Chambers*—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied 'a fair opportunity to defend against the State's accusations whenever critical evidence' favorable to him is excluded," *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996), I respectfully dissent.

## I

### A

All evidence in this case points to the conclusion that either Armenia Cudjo or his brother Gregory brutally murdered Amelia Prokuda after engaging in (apparently) consensual sexual intercourse. After the murder, evidence against Armenia quickly mounted. Gregory told officers that he had con-fessed to the crime in some detail, and he was shortly thereafter linked to the semen found on her bound, gagged, beaten, and nearly naked body. *People v. Cudjo*, 863 P.2d 635, 643-64 (Cal. 1993).

Unable to deny that he had been at the house—and thus would likely have left the single set of footprints found in the rain-washed ground outside her home, *id.* at 644—Armenia tried to convince officers that Mrs. Prokuda had traded sexual favors for $50 worth of cocaine. *Id.* at 645. He then claimed to have gone on a long, slow jog while someone else commit-ted the crime (apparently without leaving any shoe prints). This story had several gaping holes. Among the most blatant were that there was no cocaine found in the Prokuda home and that Mrs. Prokuda's "blood tested negative for alcohol and an array of illegal drugs, including cocaine." *Id.* at 642.

But, Armenia protested, it could not have been him. He had a goatee and several tattoos, but the only eye witness—

Prokuda's five-year-old son Kevin—said that the man who attacked his mother was clean shaven and had no tattoos. *Id.* Though Kevin could not pick the assailant out of a lineup or identify several other pieces of evidence from the scene, Armenia asserts that he *must* have been talking about his brother Gregory. *Id.* at 645.

Armenia sought to make his story sound more plausible by calling John Lee Culver to the stand. According to Culver, Gregory confessed to the crime while the two shared a cell in the local jail. *Id.* at 647. Culver, however, was far from an ideal witness. He was both a criminal and a decades-long friend of Armenia, and his account of Gregory's confession did not match the physical evidence of the crime. *Id.* at 649. More importantly, Culver admitted that he filled in any gaps in Gregory's confession with his own speculation, *see id.* (stating initially that Gregory had confessed to implicating Armenia before admitting "that he merely inferred that Gregory had blamed defendant"), or through conference with Armenia's family and defense team, *id.* at 647 (no mention of a confession at all until contacted by defense team and none of a little boy until speaking with Gregory shortly before testifying).

The prosecutor argued that this testimony should be excluded as "inherently incredible." *Id.* at 648. The trial court agreed, applying a state evidentiary provision allowing it to exclude evidence whose probative value is substantially outweighed by the danger of undue prejudice or misleading the jury. *Id.* at 648 (Cal. Evid. Code § 352). (The district court also decided that the evidence was insufficiently reliable to warrant admission under the hearsay exception for statements against penal interest. *Id.* (Cal. Evid. Code § 1230*).*)

B

The California Supreme Court concluded that this was an error of state law. It clarified that ordinarily only the reliabil-

ity of the declarant is relevant to the admissibility of hearsay testimony pursuant to section 1230. *Id.* at 649. It recognized that in certain "rare instances," the trial court *could* exclude hearsay statements based on "doubts about the credibility of the in-court witness." *Id.* at 650. In this case, however, the California Supreme Court concluded that because there was insufficient proof that Culver falsely recounted what Gregory said, such questions should have "be[en] left for the jury's resolution." *Id.* Similarly, the court concluded the concerns about Culver's reliability should not have played a role in the prejudice calculus under section 352. *Id.*

It determined nonetheless that there was no constitutional error. Having reviewed the *Chambers* line of cases, the court concluded that "mere erroneous exercise of discretion under . . . normal rules" of evidence "does not implicate the federal Constitution." *Id.* at 652. *Chambers* and its progeny, the court decided, were implicated only when "the constitutional right to present and confront material witnesses [is] infringed by *general rules* of evidence or procedure which preclude material testimony or pertinent cross-examination for arbitrary reasons, such as unwarranted and overbroad assumptions of untrustworthiness." *Id.* Because this case did not involve such an overbroad assumption, the court reviewed whether Armenia was prejudiced under the standard rule for erroneous evidentiary decisions. *Id.* Finding no such prejudice, the California Supreme Court affirmed the conviction.

## II

The panel majority concludes that this was an unreasonable interpretation of *Chambers*. I disagree.

In *Chambers*, the defendant was accused of shooting a police officer. No one saw Chambers shoot the officer, and there was no evidence that Chambers owned a firearm. 410 U.S. at 289. By contrast, a third party named Gable McDonald was identified as the shooter, owned a gun, and confessed

to the crime three times (once in a sworn affidavit). *Id.* at 292. Chambers was prevented from offering much of this evidence. He was allowed to call MacDonald, but on cross-examination the government established that McDonald had repudiated at least one of his confessions. Chambers was not allowed on re-direct to give the jury reasons to credit his confession over his repudiation because Mississippi continued to adhere to the "voucher" rule, which binds a party to the assertions of his or her witness. *Id.* at 298. He was not even allowed to offer the testimony of the people to whom MacDonald confessed because—unlike most other states—Mississippi had not recognized an exception to the bar against hearsay for statements against penal interest. *Id.* at 293-94. Deeming both of these rules to be outdated and arbitrary, the Court concluded that under the specific circumstances of that case, Chambers was denied due process of law. *Id.* at 302-03.

This case does not present the same circumstances. In *Chambers*, there was no question about the reliability of those individuals who were recounting MacDonald's confessions. MacDonald also testified himself, offering the prosecution the opportunity to test the veracity of his confession. *Id.* at 301. Here, by contrast, the only evidence that Gregory Cudjo admitted to the crime was the word of a witness of dubious veracity. *Cudjo*, 863 P.2d at 651 (agreeing that the trial court's "doubts about Culver's credibility [were] reasonable and legitimate").

Moreover, the trial court's error was materially different from that found to be a due process violation in *Chambers*. There, the only question before the Court was whether the state could "mechanistically apply" two different rules that most jurisdictions had abandoned to the "facts and circumstances of [that] case." *Chambers*, 410 U.S. at 302. The Court did not examine the issue here: whether a single erroneous ruling regarding state evidentiary law could render a conviction a violation of due process. The same is true of the entire line of cases on which Armenia relies. *See Green v. Georgia*,

442 U.S. 95 (1978) (holding that due process required a statement against penal interest exception to hearsay in the penalty phase of a capital case); *Rock v. Arkansas*, 483 U.S. 44, 58 (1987) (rule against hypnotically-refreshed testimony may not prevent a defendant from testifying in her own defense); *see also Crane v. Kentucky*, 476 U.S. 683, 686 (1968); *Washington v. Texas*, 388 U.S. 14 (1967); *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) (synthesizing this line of cases as holding that "the Constitution . . . prohibits the exclusion of defense evidence *under rules* that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote" but *not* under "*well-established rules* of evidence [which] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice . . . or potential to mislead the jury").

The majority has not cited a single Supreme Court decision extending *Chambers* beyond situations where the state correctly but mechanistically applied an impermissible rule to those where it made a mistake in applying a perfectly permissible rule.[1] We therefore cannot say that the California Supreme Court's decision to uphold a verdict involving only the latter error "was contrary to or an unreasonable application of [Supreme Court] precedent." *Penry v. Johnson*, 532 U.S. 782, 794 (2001). As we have recognized, a "state court's decision [is] not contrary to clearly established federal law . . . [if it] would have required an extension of [a] specialty doctrine." *Benitez v. Garcia*, 495 F.3d 640, 644 (9th Cir. 2007). Even if we think such an extension is the logical result of

---

[1]Indeed, we have already recognized that the "Supreme Court has not addressed [the] issue . . . [of] whether a trial court's discretionary determination to exclude evidence violated a defendant's constitutional rights." *Moses v. Payne*, 543 F.3d 1090, 1103 (9th Cir. 2008). The majority's attempt to fill this gap with *Lunbery v. Hornbeak*, 605 F.3d 754 (9th Cir. 2010) is unavailing. *Lunbery* is hardly persuasive when it resurrected—without citation—an interpretation of *Chambers* that we had already rejected, *Moses*, 543 F.3d at 1103, and that the Court had repudiated, *Egelhoff*, 518 U.S. at 53.

existing precedent, we may grant a writ of habeas corpus only "if the refusal to extend [the Court's previous holdings] was objectively unreasonable." *Id.*; *see also Hawkins v. Ala.*, 318 F.3d 1302, 1306 n.3 (11th Cir. 2003).

The California Supreme Court did not act unreasonably when it declined to extend *Chambers* to cover a simple error in balancing the prejudicial effect against the probative value of a piece of evidence. The rule the majority now endorses "invites federal constitutional scrutiny each and every time, on the basis of particular circumstances, [a district court decides] to exclude a defense witness as unworthy of credit." *Cudjo*, 863 P.3d at 652. The *Chambers* line of cases did not suggest—let alone clearly establish—that the due process clause mandates such intrusive review of a state court's evidentiary rulings. *Cf. Fortini*, 257 F.3d at 47 ("[N]ot every *ad hoc* mistake in applying state evidence rules, even in a murder case, should be called a violation of due process; otherwise every significant state court error in excluding evidence offered by the defendant would be a basis for undoing the conviction.").

## III

Without that extension, all that is left of this case is an error of state law, albeit a significant one. Because we lack authority to issue habeas relief based upon such an error, *see, e.g.*, *Swarthout v. Cooke*, 131 S. Ct. 859 (2011); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), I respectfully dissent.[2]

---

[2]The majority's assertion that the prosecutor's isolated reference to the defendant's race in his closing statement similarly violated Armenia's due process rights is similarly flawed. The California Supreme Court properly noted that this was misconduct, but correctly applied controlling Supreme Court case law. *See, e.g.*, *Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47 (1973) (finding no constitutionally reversible error in improper but isolated comments during closing arguments); *see also Parker v. Matthews*, 567 U.S. __, 132 S. Ct. 2148, 2153 (2012) (reaffirming *Donnelly*).