Filed 3/11/21  P. v. Lambert CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>QUINTON WAYNE LAMBERT,<br><br>Defendant and Appellant. | F077901<br><br>(Stanislaus Super. Ct. No. 1461493)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Dawna Reeves, Judge.

William W. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and A. Kay Lauterbach, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant and defendant Quinton Wayne Lambert was convicted of manslaughter in connection with the death of a neighbor. He contends the court prejudicially erred by excluding evidence that his sister-in-law, Cory Cline (Cline), with whom he lived, confessed to killing the victim. Defendant further argues his counsel was ineffective for failing to object to the sentencing court's consideration of several factors in aggravation of his sentence on a firearm enhancement. We find any alleged errors were harmless and affirm the judgment.

## BACKGROUND

In an information filed in June 2016, the district attorney charged defendant and Cline with the first degree murder of Mario Albo, Jr. (count 1; Pen. Code, § 187),[1] during which defendant personally and intentionally discharged a firearm and proximately caused the death of another person (§ 12022.53, subd. (d).)

A jury acquitted defendant of first degree murder but convicted him of voluntary manslaughter. The jury also found defendant personally used a firearm in the commission of the offense, in violation of section 12022.5, subdivision (a).

The court sentenced defendant to six years on count 1, plus a consecutive term of ten years for the section 12022.5, subdivision (a) enhancement. The court also imposed various fines, fees and restitution.

## TRIAL EVIDENCE

Donald Yeary worked for Phil Calloway's company, Calloway Construction, in July 2013. Calloway would purchase rundown houses and Yeary would remodel them for him. Eventually, Calloway would rent out the houses.

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

2.

One of the houses Yeary worked on was on Ridge Road in Modesto. At the time, defendant lived in the home with Cline and her adult son, Nathien.[2] Nathien lived in a detached studio with a garage in the back of the property.

On one occasion, Yeary had a beer with defendant at the home. Defendant showed Yeary a .357 chrome revolver and asked if Yeary could obtain some bullets. Two weeks later, Yeary stopped by defendant's house and gave him six or seven .38-caliber rounds.

On July 23,[3] Yeary and defendant went to a store to get beer. They returned to defendant's house and stood outside drinking their beers. Defendant gave Yeary a "rolled up or folded up towel" and told him to get rid of it. Yeary asked why, but defendant would not tell him. Yeary put the rolled-up towel in his truck. Once he got home, Yeary discovered there was a .38-caliber gun in the towel. It was not the same gun defendant had shown him weeks prior. Yeary put the gun in a metal locker on his property. Yeary testified that another man living in his home, Dale Rutherford, subsequently wiped down the gun.[4] Rutherford placed the gun in a "hidden" area on the far edge of Yeary's property used for agriculture.

Defendant called Yeary early the next morning. Defendant asked if Yeary could come help him move something. Yeary went to defendant's property and entered his home through a side door. When he entered, defendant locked the door behind him. Cline was in the room as well and seemed distressed. Yeary asked what defendant needed moved, and defendant brought him into the living room. Yeary smelled a "real

---

[2] Earlier, Cline's 10- or 11-year-old daughter, "Tabby," and defendant's daughter, Traniece, had lived with them as well.

[3] All dates referenced herein are in the year 2013 unless otherwise noted.

[4] However, a Lieutenant Brandon Kiely with the sheriff's office said Yeary had told him that he (Yeary) had wiped down the gun. Yeary also told Lieutenant Kiely that he gave the gun to an associate and told him to "place it somewhere where he basically wouldn't know where it was."

strong odor" that was "worse than a dead animal." Yeary saw a rolled-up towel or blanket behind a couch, and suspected there was a body inside. Defendant wanted to put the body in Yeary's truck so he could "get rid of it." Yeary said he had to go to work and could not take the body. Yeary helped defendant carry the body to a garage behind defendant's house. As they were carrying the body, the "wrappings" moved and Yeary saw a face. Yeary got blood on his pants and Cline offered to rinse them off in a sink. At some point, Cline told Yeary that if he "said anything" then he should "be worried." Yeary left and went to work.

Yeary called his boss and told him what had happened. Later that day, Yeary talked to law enforcement. Deputies responded to defendant's property and found Mario Albo, Jr.'s body in the detached garage.

*Defendant's First Interrogation*

A detective interrogated defendant on the evening of July 24. After being read his *Miranda*[5] rights, defendant agreed to speak with the detective. Defendant denied knowing whose body was found in the garage. Defendant claimed he did not have a key to the garage.

Defendant claimed he had last seen Albo three or four days prior. He said the two of them had been on the porch drinking and "got f[**]ked up." Defendant left to get some beer from the store and when he returned Albo was gone. Defendant said he then traveled to Oakland and, upon his return, he "smelled something." He asked Cline what the smell was. He also wondered why their dog was outside, since it normally stayed in the house. Defendant volunteered that Nathien and Cline were the only two people who had a key to the garage. Defendant said he never goes into the garage.

Defendant said that on the day after he returned from Oakland, he and Cline walked to a local convenience store and stopped by Albo's house on the way back.

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436.

Albo's girlfriend, Samantha, asked defendant if he had seen Albo. Defendant did not want to tell her that Albo might have had another girlfriend, so he did not answer.

Defendant claimed that Cline began telling him things such as, "always take care of [my] kids" and to "not let anything happen to them." Defendant asked, "[W]hy, did you do something stupid?" Cline indicated she had not done anything stupid.

Initially defendant said he did not know whether Yeary had come over on July 23 (the day before the interrogation) to move something. Later in the interrogation, the detective told defendant that Yeary had said defendant called him to help move something. Once confronted with Yeary's statement, defendant admitted that Yeary had come to the house to move something at defendant's request. Defendant initially claimed he simply moved some smelly blankets to the garage with Yeary. Defendant claimed he did not know there was a body in the blankets. Eventually, defendant admitted he "just knew something was up" because Albo was not present when he returned from the store to buy beers. Defendant suspected that "somebody got yacked," which the detective understood to mean "somebody got hurt or injured or killed."

Defendant eventually admitted that there was probably a body in the blanket. Defendant also said his revolver-style gun was missing.

Defendant claimed that Yeary mentioned that "it would be nice to have a gun" so defendant tried to give him two guns: a .38 Special revolver and another gun. Yeary only wanted one gun and took the .38 Special revolver.

Defendant also mentioned another gun that he "thinks" he put in a "hole" in an alleyway. !(RT 418-419)! Defendant said his fingerprints would be on the gun.[6]

Defendant said Cline and Albo "didn't really like each other." Defendant described Cline and Albo's relationship as "volatile" and "vicious." On one occasion,

---

[6] Eventually, this gun – a .357 revolver – was located in a trash pile in an alleyway behind a house on nearby Vernon Street.

Albo was "picking at her" so she punched him in the chest. Defendant told Albo that Cline "wasn't to be messed with" and that she could fight and take care of herself. Defendant described an incident where Albo had been grabbing Cline's buttocks causing Cline to complain.[7]

Defendant said he found out Albo had "laced" Cline, which the detective understood to mean putting something in drugs or a drink. Defendant also described an incident in early June where Cline had overdosed and went into a coma.

Defendant said Cline had psychiatric issues and was "on several different medications." He also said she was a hypochondriac and would "cut herself."

Defendant said that Albo showed him a gun several times. Cline told him, "[Y]ou better not bring that in my effin' house."

Defendant told detectives that Nathien "got along with" Albo even though the two "didn't really like each other a lot."

Defendant said he drank four to six beers per day.

*Second Interrogation*

Defendant was again interrogated on July 26. Video of most of the interrogation was played for the jury.

During this interrogation, defendant provided a different version of events. Defendant claimed that while he and Albo were on the porch, Albo threatened to kill Cline and Nathien. Albo pulled a gun on defendant. Defendant grabbed Albo's wrist, then "[b]oom." Defendant said that either he or Cline covered up the body. When asked if this incident with Albo occurred on Monday night (i.e., two days before the Wednesday when deputies located the body), defendant replied that "sound[ed] right." Defendant said he believed Albo would have shot Nathien.

---

[7] It is unclear whether this is the same incident where Cline punched Albo.

6.

*Informant Antonio Smith*

Antonio Smith was in custody with defendant due to an unrelated homicide charge. Smith entered into a plea bargain which provided that he would testify truthfully in defendant's trial in exchange for leniency in his own case.

While in jail, Smith came to know defendant. Smith said that, unlike others, defendant spoke openly about his case. Defendant told Smith that he returned from a store to find Cline and Albo in his house. Albo had previously been told not to come to the house, so defendant and Albo had a "confrontation." Albo then left the home. Cline began having a seizure and ended up in the hospital. Thereafter, "it was determined" that Albo had tried to poison or "drug" Cline. Defendant's "attitude changed as far as him wanting to get back at him, do something to him."

Sometime after Cline left the hospital, Albo returned to the house. An argument broke out. Albo tried to "break the ice" by offering everyone free "dope." Albo said, " What? You guys think I laced this too? You think this is laced?" Albo then went down to "do his line of dope." As he came back up, defendant shot him in the forehead. Defendant said he shot Albo "[r]ight between the eyes." Defendant said Albo did a "dolphin kick" when he fell to the floor and was convulsing. Later, while defendant was watching a swimming competition in the Summer Olympics, he said "that's what my victim did … [a]fter I shot him, he was doing the dolphin kick."

Defendant said "Donny" helped him move the body to a detached garage. Defendant also told Smith the police had identified the wrong gun as the murder weapon.

Smith said he did not have access to defendant's personal papers, nor did he see any articles or television programming about defendant's case.

*Neighbor Kathleen Treat*

Defendant's neighbor, Kathleen Treat, testified that Albo was a good friend of hers. Treat knew Albo always carried a .38-caliber with him for protection. She

confirmed that People's exhibit No. 6 was Albo's gun. Albo usually carried the gun in the front of his belt. Albo had sold drugs to Treat's son in the past.

Albo also appeared to be friendly with defendant, as the two would socialize and enjoy each other's company. Cline and Albo were also good friends. In fact, they acted "real friendly" with one another, leading Treat to testify that it was "[v]ery possible" that the two were romantically involved.

Treat testified that about three weeks prior to deputies arriving at defendant's house, Cline was released from the hospital. Cline was upset with Albo at that time.

About two weeks prior to Albo's death, defendant pulled a grey .38-caliber snub nose revolver with a black handle out of a purple Crown Royal bag and waved it around saying, "I can pick anybody off walking down the street without them even knowing it." Treat said defendant "always" had the purple Crown Royal bag underneath the front seat of his car.

The day before deputies came to defendant's house, Cline came over to Treat's house. Cline was "real nervous" and defendant called her several times, which was unusual.

*Traniece Davett*

Defendant's daughter, Traniece Davett, lived at defendant's home in the spring of 2013 until June or early July of that year. According to Davett, Albo would come to defendant's home every day or every other day, and the two would socialize. However, Albo and Cline did not get along. On one occasion, Albo grabbed Cline's "behind" and she "did not like him from that time" on.

Davett also recalled Albo "hitting on" her (i.e., Davett).

Davett testified that Treat stopped coming over to speak with Cline once defendant moved in.

8.

*Norrval Williams*

Norrval Williams, a member of the Blood gang, was in custody with defendant a few years prior to trial.[8]  Antonio Smith is a family friend of Williams.

On multiple occasions, Williams saw Smith going over defendant's "paperwork" with defendant.  Smith also told Williams he would "do anything to get out of jail."  Smith said he would "tell on somebody, he'd lie on them saying that they did something they didn't do, just so he can get a chance for him to get some freedom."[9]

On cross-examination, the prosecutor elicited testimony from Williams that he sent letters to defendant while in custody, including one that said, "That's why it was easy for me to bond with you from day one.  Real recognize real blood."  The letter ended:  "Until next time, I send my utmost respect and full salute your way, big bruh, with honor."  However, Williams claimed defendant was not a Blood gang member.

*Dontae Galindo*

Dontae Galindo was housed with defendant at the time of trial.  In his past, Galindo had been convicted of possession of cocaine for sale and manufacturing a controlled substance.  Galindo also knew Smith.  Smith would "go over" defendant's case with him.  Galindo heard Smith tell defendant there was "no evidence on him," so Smith did not know why defendant was in custody.  Smith said all the evidence pointed to Cline.

Smith told Galindo he was facing up to 30 years in prison.  Smith's wife told him she "couldn't do 30 years; he better figure something out."  Smith told Galindo he would "roll over on his co-defendant."

---

[8] Williams had previously been convicted of shooting at a vehicle, and a crime relating to assaulting someone with a firearm.

[9] Another defense witness, Kendall Johnson, offered similar testimony.  The prosecution introduced evidence of a botched sting operation wherein Johnson had pretended he would cooperate with law enforcement only to pocket thousands of dollars intended to be used to purchase illegal firearms.

*Defendant's Testimony*

Defendant testified that Albo would sell methamphetamine and weed to Cline. One day, when defendant was returning from the store, he saw Albo running out of Cline's door. That "shocked" defendant because Cline would never let Albo in the house when defendant was not home. Defendant asked where he was going and Albo said, "I have got to go make a drop." Defendant went inside and asked Cline what was wrong. Cline kept replying, "Nothing." Cline went to her room, then returned in a frazzled and irate state. She kept referring to Albo as a motherf[**]ker. Cline returned to her room and defendant went to his. Later, defendant heard someone yelling and saw Cline "flopping like she is having a bad seizure" on the driveway. Her lips were turning blue and she went into a coma for nine days.

When Cline recovered consciousness, Treat drove defendant to the hospital. Cline had to use a wheelchair for two weeks. After the incident, Cline became more paranoid, and "mean." Cline was being medicated for schizophrenia.

Defendant asked Albo about the drugs he had sold to Cline before the coma. Albo replied, "I always keep two bags, one for guys and one for the b[**]ches." Albo would not explain in detail how the latter batch was different except that it made "them" more "accommodating." Afterwards, Albo said Cline needed to "get over it."

The relationship between Cline and Albo became toxic. Cline would always call Albo a "b[**]ch." Albo would use the same word to describe Cline. However, defendant continued to talk with Albo and would still drink beer with him on the porch. Cline would get mad at defendant for talking with Albo. During one conversation, Albo told defendant that he had committed "a home invasion the other night" and "shot a kid on the way out." Cline overheard and began screaming that Albo needed to leave. Cline also told defendant he better not let Albo come back. Defendant told Albo not to come over anymore. Albo said, "You gonna take this b[**]ch over me?" Defendant told him, "[J]ust go."

10.

Two or three weeks later, Albo approached defendant while he was drinking on the porch. Defendant asked what Albo wanted. Albo said he wanted to talk for a minute. Defendant and Albo went inside. Defendant asked, "[W]hat's up?" Albo said, "I thought we were good." Defendant said, "[N]ot after what you did." Albo, said, "[D]o you want to do something?" Defendant said, "No, I'm cool." Albo replied, "Oh, so you think I'm going to lace you like I did the b[**]ch?" Defendant told Albo to leave. Albo remained seated, pulled out a little baggie and straw, and then "[did] some." He offered "some" to defendant, who declined.

Albo then pulled out a gun and began waving it. He said, "the b[**]ch don't think I'll pop her." Albo then pointed the gun towards defendant's head and said, "Nate don't think I'll kill his ass." Albo said Cline's claim that he laced her drugs was preventing him from making money. Albo then said he knew where Tabby (defendant's daughter) lives and that he would "go after her." Defendant grabbed Albo and pushed him into the wall. The two became entangled and the "[n]ext thing" was a "boom" and a "flash." Albo "goes down" and defendant sees Cline holding a gun. Albo was not moving. Defendant told Cline that everything was going to be alright. Cline was stiff and shaking.

Defendant's "only thought" was about how to get his "sister" "out of this mess." Defendant called Yeary, who came over and explained how to clean the mess. Yeary said they needed peroxide to "take the blood out." Defendant denied locking the door behind Yeary. Yeary suggested they take Albo's body "to the back" and that Yeary would return later to retrieve the body.

Yeary asked defendant what he was going to do with Albo's gun. Defendant said, "[T]ake it, I don't care." Yeary retrieved the gun and placed it in his waistband.

As for the gun Cline used to shoot Albo, defendant told her to "get rid" of it. Defendant walked with Cline past a local convenience store. Sometime after turning down a street called Beverly, Cline pulled the gun out, wiped it down, and "[s]hoved it in the ground."

11.

Defendant testified that he met Smith while in custody for the present charges. Defendant claimed he told Smith he was innocent.

Smith went through defendant's paperwork around the time of his preliminary hearing. Smith said he did not know why defendant was in custody, considering that Cline had "confessed."

Defendant knew Smith's wife was having difficulty with the possibility Smith would be incarcerated for 30 years or more. Defendant told Smith he "probably got to tell on somebody." Three days later, defendant learned that Smith heeded his advice by "telling on" defendant.

*Ammunition*

A small cloth bag containing ten .38-caliber rounds and one .38-caliber casing was found in a pouch in a laundry basket near a toilet. The bag also contained an off-white crystalline substance.

*Forensic Pathologist*

The forensic pathologist concluded Albo died from a gunshot wound to the head. The bullet was fired from a gun, the muzzle of which was being held at relatively close range when fired – i.e., no closer than six or seven inches away and not farther away than about 18 inches from Albo's head. The bullet traveled on a downward trajectory; entering three inches from the top of Albo's head and exiting six inches from the top of Albo's head. Albo's body had no other injuries, including no defensive wounds.

It could not be determined what caliber of gun was used to shoot Albo.

*Toxicologist Bill Posey*

Toxicologist Bill Posey tested a sample of Albo's liver tissue from the coroner's office. Methamphetamine and amphetamine were found in the sample. However, Posey could not determine how much methamphetamine Albo had ingested or when he had taken it.

According to Posey, when someone takes methamphetamine, they experience an "up phase" and a "down phase." During the "down phase," the user becomes forceful, paranoid and, in some cases, violent. Posey could not say what phase Albo was in at the time of death.

Long term methamphetamine use tends to cause extreme violence and irrationality, which is referred to as "meth rage." Posey could not say whether Albo was addicted to methamphetamine.

## DISCUSSION

### I. Defendant has not Established Prejudicial Error in the Exclusion of Evidence of Cline's Confession

#### A. *Background Information*

In a pretrial motion in limine, defendant moved for a ruling that Cline's "confession" – described below – should be admitted at trial. The prosecution opposed the motion, and a hearing was held under Evidence Code section 402. After the court heard the testimony described below, it excluded Cline's confession because it was unreliable.

Reserve Deputy Kathryn Flanagan testified that she was part of the investigation into the body found at defendant's home. Flanagan was told to wait with Cline in the kitchen during the investigation. Cline appeared nervous, upset and confused. There was no air conditioning in the house, and it was very hot on that day. Cline told Flanagan that her hospitalization on May 31, 2013, was not due to seizures but instead because she had tried to commit suicide.

Deputy Flanagan eventually transported Cline to the police station. Flanagan did not initiate conversation during transport. Nonetheless, about a minute or two into the drive, Cline began talking and crying, saying, " 'I did it. I shot Mario.' " She said the specific words: " 'I shot him. I killed him.' " Cline said she had been fearful of Albo because he had come to the house and was "touching her." Cline did not explain the

touching, but she was insinuating that it was sexual. Cline became fearful, grabbed a gun out of Albo's waistband and shot him.

Eventually, Deputy Flanagan and Cline arrived at the police station, and Cline was interviewed by Detective Darwin Hatfield.[10] Hatfield initially told Cline she was not under arrest and did not have to answer any questions. Cline said Albo came into her home and was grabbing her chest. Albo said, " 'You know you want to give it to me. If you don't give it to me, I'm going to take it and then I'm going to kill your son.' " Cline used the gun in Albo's waistband to shoot him in the forehead. Cline said defendant was not present at the time.

At that point, Detective Hatfield initiated a break in the interview to talk with the detective who was interrogating defendant. The detective told Hatfield that defendant said Cline had shot Albo.

Detective Hatfield returned to Cline, informed her she was being arrested for homicide and advised her of her *Miranda* rights. Hatfield told Cline that defendant said she had shot Albo. Cline then changed her story and said that "Donny" (presumably a reference to Yeary) shot Albo. Cline now claimed that she came into the house just after Donny had shot Albo. Cline was "despondent and crying" as she accused Donny of being the shooter. Throughout the interview, Cline was "all over the place emotionally" and would change "from talking to crying to just being silent to ignoring to acknowledging."

Cline initially said she moved the body. Thereafter, she said, "the Shadow People" helped her move the body.

Two days later, Detective Hatfield interviewed Cline again. This time, Cline said that she was outside when she heard a "pop." She came into the home, saw Albo on the

---

**10** Before the interview began, Deputy Flanagan told Detective Hatfield that Cline had confessed to shooting Albo.

14.

floor, and defendant walking away. Cline was "a lot calmer" during this interview compared to the first interview.

Defense investigator Richard Paloma testified that he made numerous unsuccessful attempts to serve a subpoena on Cline in November 2017.

The court ruled the evidence of Cline's confession would be excluded because it was not reliable as required by Evidence Code section 1230. The court observed that Cline's statements suggest three different shooters: herself, defendant and "Donny" (again, presumably a reference to Yeary). However, notwithstanding the court's ruling, defendant referenced Cline's confession multiple times during his trial testimony.

Outside the presence of the jury, defense counsel suggested that he had "made the strategy call to try to get [Cline's] admission in, even if it opened the door" to introducing the other versions of events Cline had told to law enforcement.

Later, also outside the presence of the jury, defense counsel expressly renewed his request to admit Cline's confession. He argued that *Chambers v. Mississippi* (1973) 410 U.S. 284 was controlling, and the confession needed to be admitted under the due process clauses of the state and federal constitutions. Defense counsel also contended Cline's confession was admissible as a spontaneous statement under Evidence Code section 1240. The court rejected these contentions.

**B.** *Law*

All relevant evidence is admissible unless prohibited by law. (Evid. Code, § 351.) One category of evidence generally prohibited by law is hearsay evidence. (Evid. Code, § 1200, subd. (b).) " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (*Id.*, subd. (a).) However, the hearsay rule does not render inadmissible statements against the speaker's penal interest. (Evid. Code, § 1230.) (*Ibid.*)

15.

"A party who maintains that an out-of-court statement is admissible under this exception as a declaration against penal interest must show that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. [Citation.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 607, italics omitted (*Cudjo*).) "To determine whether the declaration passes the required threshold of trustworthiness, a trial court 'may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.]" (*Ibid*.) "Courts applying section 1230 to determine the basic trustworthiness of a proffered declaration are … to 'consider all the surrounding circumstances to determine if a reasonable person in [the declarant's] position would have made the statements if they weren't true.' [Citation.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 618.)

We review the trial court's determination for abuse of discretion.[11] (*Cudjo*, *supra*, 6 Cal.4th at p. 607.)

## C.    *Application*

The Attorney General argues the trial court properly excluded Cline's confession because it was unreliable. Specifically, the Attorney General notes Cline was emotional, confused, and upset when she made the confession. However, the fact that a speaker was emotional and upset does not necessarily render the statement unreliable. Indeed, it might even be expected that a declarant making a *true* confession to killing someone would be emotional and upset.

---

[11] Defendant claims he is arguing that the trial court misconstrued Evidence Code section 1230 and, therefore, we should apply a de novo standard of review. However, defendant's argument that "Cline's subsequent self-exculpatory statements should not be given equal weight with her self-inculpatory statements" in determining reliability does not present an issue of statutory construction.

16.

Granted, the testimony that Cline was "confused" at the time is different. Generally, a declarant being "confused" might make the statement less reliable. To similar effect are Cline's later contradictory claims that Yeary actually shot Albo (or possibly defendant) and that "shadow people" helped her move the body. But no statement is so trustworthy that its veracity is beyond question. That cannot be the standard for admitting statements against penal interest. That is why statements against penal interest are admissible even when there may be *some* reason to doubt its veracity. (E.g., *Cudjo*, *supra*, 6 Cal.4th at pp. 607–608 [fact that statement was "inconsistent to some extent with the physical evidence" did not warrant exclusion because the discrepancies did not "negate all possibility" of statement being true.]) The question is not whether there is *any* reason to doubt the statement, but instead whether "the declaration was *sufficiently* reliable to warrant admission despite its hearsay character. [Citation.]" (*Id*., at p. 607, italics added.) Sufficiently reliable does not mean categorically unimpeachable.

In our view, statements against penal interest should be admitted even if there are some questions about its veracity, so long as those questions do not render the statement fundamentally unreliable. In such a case, the facts suggesting unreliability can be presented alongside those suggesting reliability (see Evid. Code, § 356), and it can be left to the jury to perform its crucial role in resolving credibility issues. (See *Cudjo v. Ayers* (9th Cir. 2012) 698 F.3d 752, 763 ["questions of credibility are for the jury to decide"].) In contrast, disallowing a defendant to even *present* evidence of a plausible third-party confession for the jury's consideration merely because there is some suggestion of unreliability may often raise serious constitutional concerns. (See *People v. Cudjo*, *supra*, 6 Cal.4th at pp. 638–641 (dis. opn. of Kennard, J.); cf. *Chambers v. Mississippi*,

17.

*supra*, 410 U.S. at pp. 298–303.)[12]  Here, however, we need not conclusively resolve whether the evidence was erroneously excluded because we find the ruling harmless.

### Harmlessness

When a trial court erroneously excludes evidence under state evidentiary law, we consider the issue of harmlessness under the *Watson*[13] standard.  (See *People v. Duarte*, *supra*, 24 Cal.4th at pp. 618–619.)  Under that test, we ask whether " 'it is reasonably probable that a result more favorable to defendant would have been reached' " without the error.  (*Id.* at p. 619.)

If the trial court erroneously excludes evidence and such error infringes defendant's federal constitutional rights, we consider the issue of harmlessness under the

---

[12] However, a trial court's evidentiary ruling may not be overturned merely because there is more than one reasonable approach to the issue.  Here, the trial court was rightly concerned with Cline's inconsistent statements.  Defendant disagrees, saying some courts simply redact the self-exculpatory statements while admitting the self-inculpatory statements.  However, where the self-exculpatory statements *contradict* the self-inculpatory statements, they bring the reliability of the self-inculpatory statements into question.  Indeed, when a declarant provides other versions of events contradictory to the inculpatory statement, the inconsistency is an "obvious" indicator of unreliability.  (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1109.)  For example, if a declarant offers three inconsistent versions of events, then at least two of the three statements are necessarily untruthful, "rendering the reliability of any of the statements questionable."  (*People v. Geier* (2007) 41 Cal.4th 555, 585, overruled on other grounds as recognized in *People v. Seumanu* (2015) 61 Cal.4th 1293, 1320.)

Defendant contends that the other, self-exculpatory versions of events that Cline provided were less reliable than the confession.  He argues that Cline offered the self-exculpatory versions of events while in custody.  In contrast, she initially confessed to Flanagan while she was still in her residence.  And she was not under arrest when she repeated the confession at the police station.

We think the best approach here would have been to admit Cline's inculpatory statements *as well as* her other, inconsistent versions of events, and let the jury resolve credibility issues.  (See Evid. Code, § 356; see also *People v. Armstrong* (2019) 6 Cal.5th 735, 787 [Evidence Code section 356 most often operates as a hearsay exception].)  However, we are hesitant to say the trial court's contrary approach was an abuse of discretion.

[13] *People v. Watson* (1956) 46 Cal.2d 818.

*Chapman*[14] standard. (See *Cudjo v. Ayers*, *supra*, 698 F.3d at pp. 768–769.) Under *Chapman* we ask "whether the error has been proven harmless beyond a reasonable doubt. [Citation.]" (*Cudjo v. Ayers*, at p. 768.)

As explained below, we conclude that even if error occurred, and even if that error invoked the more stringent *Chapman* test, it was harmless.

Despite the court's exclusion of Cline's confession to Deputy Flanagan and Detective Hatfield, the fact that Cline confessed was made known to the jury. Defendant referenced Cline's confession multiple times during his testimony. When discussing Smith's review of his paperwork, defendant testified that Smith said, "[W]ell, right here she [Cline] confessed to doing it." Shortly thereafter, defendant testified Smith said "he didn't know why [defendant] was here [in custody] because Cory [Cline] confessed."

As a result of this testimony, the generic fact that Cline had "confessed" was before the jury. Granted, the jury did not get to hear Cline's actual words: "I shot him. I killed him." But there is nothing particularly compelling about the wording of Cline's short confession to suggest it had any marginal utility to defendant's case above and beyond the fact that she had confessed. We are therefore confident any error in the exclusion of the confession itself was harmless beyond a reasonable doubt.

## II. Defendant has not Established Prejudicially Ineffective Assistance of Counsel

Defendant next contends that his sentence must be reversed due to ineffective assistance of counsel.

In imposing sentence, the court made the following comments:

> "The crime involved great violence and great bodily harm. [¶] The defendant was armed with and used a firearm at the time of the offense. [¶] The defendant encouraged others to participate in concealing the commission of the crime. [¶] The defendant has engaged in violent conduct that indicates a serious danger to society. [¶] The defendant's prior convictions as an adult have been numerous and are of increasing

---

[14] *Chapman v. California* (1967) 386 U.S. 18.

19.

seriousness. The court notes that, according to the criminal history included in the probation officer's report, convictions for Mr. Lambert range from 1989 through 2013 with no significant periods of years free of a new conviction or return to custody. Criminal history includes both violent and serious felonies that were not alleged here."

The court further observed that defendant served a prior prison term, as well as multiple "commitments" to the county jail. The court also noted defendant was on probation for possession of ammunition as a felon at the time of the present offense. Indeed, that offense preceded the present offense by only about six months. The court referenced the fact that defendant had "multiple grants of probation and parole with no apparent rehabilitation." Finally, the court observed that the "most aggravating fact in this case … is that even though prohibited and even though [defendant has] previously been convicted of firearms violations, [defendant is] still … obtaining and carrying a firearm …." The court stated there was only one factor in mitigation: the victim was armed with a firearm and his role was unclear.

Finally, the court stated,

> "The factors in aggravation heavily outweigh the factors in mitigation. Nonetheless, the Court has chosen the midterm of six years for the main offense and the aggravated term for the firearm use because of the aggravating facts that the Court just mentioned."

Defendant insists it was improper for the court to consider his "obtaining and carrying a firearm" because that was essentially an element of the enhancement. (See *People v. Clark* (1992) 12 Cal.App.4th 663, 666 ["A circumstance which is an element of the substantive offense cannot be used as a factor in aggravation. [Citation.]"]) Similarly, he argues the court should not have considered "great violence and bodily harm" as an aggravating factor because that is inherent to the crime of manslaughter. Defendant argues that because the court erred in these ways, and his trial counsel failed to object, he was prejudicially harmed by the ineffective assistance of his counsel.

20.

To prevail on such a claim, defendant "must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. [Citations.]" (*In re Gay* (2000) 8 Cal.5th 1059, 1073.) When evaluating a claim of ineffective assistance of counsel, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies…. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."[15] (*People v. Carrasco* (2014) 59 Cal.4th 924, 982, citing *Strickland v. Washington* (1984) 466 U.S. 668, 697.)

Here, we conclude defendant has failed to show prejudice. Even when a sentencing court relies on improper factors in aggravation, reversal is not warranted where there is no reasonable probability the sentencing court would reach a different conclusion had the improper factors been excluded. (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 195–196; *People v. Watkins* (1992) 6 Cal.App.4th 595, 601–602.) By the same rationale, a defendant cannot establish prejudicial ineffective assistance of counsel for failure to object to a sentencing factor when there is no reasonable probability a sentencing court would have reached a different conclusion if such an objection had been made. Here, even assuming the court relied on two improper factors in aggravation, several additional aggravating factors remained, including: defendant encouraged others to participate in concealing the commission of the crime (Rules of Court, rule 4.421(a)(4)); his prior convictions were numerous and increasing in seriousness (*id.*, rule 4.421(b)(2)); he previously served a prison term (*id.*, rule 4.421(b)(3)); he was on probation when he committed the present offense (*id.*, rule 4.421(b)(4)); and his prior performance on probation and parole was unsatisfactory (*id.*, rule 4.421(b)(5).) Given the numerous and substantial factors in aggravation that remain undisputed, defendant cannot

---

[15] As explained below, we do follow this course, rendering moot defendant's other contentions on the issue.

establish there is a reasonable probability the sentencing court would have made a more favorable decision had it ignored the two challenged factors.  The fact that the court selected the middle term on the manslaughter count does not alter this conclusion.  Consequently, his ineffective assistance of counsel claim fails.

## DISPOSITION

The judgment is affirmed.


POOCHIGIAN, Acting P.J.

WE CONCUR:


DETJEN, J.


MEEHAN, J.

22.